# SUPREME COURT.

## THEODORE SALTUS and FRANCIS H. SALTUS agt. LANSING PRUYN and others.

No *trustee* can, directly or indirectly, become the purchaser of the subject of his trust.

Where, on a motion to *reform a deed* of real and personal property, and to settle the question as to whether the conveyance was made subject to the payment, by the purchasers, of an incumbrance of $41,000, in addition to the consideration of $50,000 expressed in the conveyance, or whether their title was to be free and clear of all incumbrances, on payment of such consideration,

*Held*, it appearing that the conveyance was made between parties who were *executors*, and in relation to the property of the *testator*, (which was, in fact, corporate stock), that the deed was void as against all the parties in interest who did not consent, or who, being under age, were incompetent to consent. Therefore, a *reference* was ordered, to inquire into the true value of the property at the time of the consummation of the sale, and reserving all further directions, as to whether the deed should be modified, annulled, or affirmed, until the coming in of the referee's report.

*New-York Special Term, January,* 1859.

MOTION by plaintiffs to reform a deed of real and personal estate.

> FIELD & SLUYTER, *for motion.*
> E. A. DOOLITTLE, *opposed.*

ROOSEVELT, Justice.    The plaintiffs are two of the sons of the late Francis Saltus.    One of them is also an executor of his will.    After their father's death, they became purchasers of all the property of the Peru Iron Company, of which their father, in his lifetime, with the exception of a few shares, was the sole stockholder.    The purchase included the lands adjacent to the works—some standing in the corporate name, and some in that of the testator—all situated in the counties of Essex and Clinton.    But the conveyance was made solely in the name of the executors.

Soon after the supposed completion of the transaction, a dis-

pute arose as to the terms of sale; the purchasers alleging that the price was to be $50,000 "free and clear," as they express it; and the son-in-law and daughter-in-law of the testator, representing two-eighths of the estate, insisting that the purchasers were to assume, in addition, a debt of the Iron Company, which is set down at $41,737.

All the other representatives of the testator concur with the plaintiffs. The deed, however, as drawn, would seem to correspond, in its legal effect, with the views of the defendants.

Under these circumstances, the difference, as will readily be seen, being a very substantial one, the plaintiffs file their bill to reform the conveyance.

The cause was tried without a jury. Both the plaintiffs and their mother were examined as witnesses on one side, and the defendant, Mr. Pruyn, and the counsel of Mrs. Vence, on the other. Their statements, on the direct point in issue, are contradictory, and indicative, at least, of a very remarkable misapprehension of each others' views. All that the court, in such a case, can do is to weigh probabilities, and approximate to the truth. Absolute certainty is unattainable.

It may be observed, in the first place, that the arrangement was not a hasty one. Its inception was in April or May, 1854, its consummation in April or May, 1856. And during the long interval of two years, it was the subject of numerous conversations. The original proposal, whether made to or by Mr. Pruyn, was $50,000, and that continued to be the sum, without variation, to the end—and Mr. Pruyn is sworn to have said, although he has "no recollection" himself of such a statement, that it would "swamp" the purchasers at that.

Notwithstanding this ample interval taken for deliberation, no progress seems to have been made towards correcting the very vague and confused notions which were entertained by the parties, and on which they negotiated and acted, as to the title and true position of the property proposed to be sold.

The Peru Iron Company was not a partnership, but a corporate body; and, although Mr. Saltus owned more than ninety per cent. of the shares, he was not the legal owner of

the corporate property, nor the legal debtor for the corporate liabilities. As to that property, he was a stockholder, and nothing more. This interest, in the eye of the law, was personal, and not real; and his executors, as executors merely, and without any special power in the will, were authorized to sell it, not as so many acres of land, but as so many shares of stock. As stock, it was subject by the general law to all the debts of the corporation—as land, it was subject only to specific mortgages and judgments. Speaking, therefore, of such property, the terms " free and clear " would have two different senses. One party to the negotiation might well mean exemption from all the debts, while the other might well suppose he only referred to mortgage and judgment debts. Now, as there were mortgages in the present instance, and mortgages to a very large amount on the lands, and held, too, by the testator, Mr. Pruyn might have supposed that the expression "free and clear," if used, was intended to apply to them. And as it would seem to have been his understanding from the outset, that the mortgages should be assigned to the purchaser, it is easy to conceive that the conversations, in that particular, made no impression on his memory. On the other hand, the intended purchasers, being familiar with the property, and knowing that, as stock, it was liable to a floating debt of more than $40,000, naturally wished an exemption from such a charge. The idea must have been, and no doubt was, strongly impressed on their minds; and having repeated it, as they supposed, in every conversation, of which there were so many, they concluded, we may readily believe, that it was well understood by their brother-in-law. When the agreement, therefore, was concluded, or was supposed to be, it is quite clear that there was an essential misunderstanding. The minds of the parties never met.

: And this conclusion is confirmed by many other circumstances.

*First,* The deed itself states the consideration to be $50,000, and makes no allusion whatever to the $41,000 additional. *Second,* Instead of an assignment of stock, and by parties de-

scribing themselves merely as executors, the vendors "grant, bargain, sell, alien, release, convey and confirm"—terms applicable ordinarily to real estate—"*by virtue of the power and authority* to them in and by the said last will and testament," all those certain "lots of land," &c.   It is true, they add, after describing the real estate, all the testator's interest in "the corporation," and in all "stock, bonds, mortgages," &c.; but this does not materially weaken the argument, for they knew, one of them being president, that the stock, as such, by the terms of the charter, could only be transferred by an entry on the books of the corporation. (*See Laws of* 1824).   *Third,* So loose is the description in the deed, that it actually covers, in terms, and perhaps in legal effect, not only the property already mentioned, but "*all other property* of every kind and nature whatsoever, belonging to said Francis Saltus at the time of his death," indicating, it may be, a necessity for "reforming" the instrument as much in the interest of the defendants as of the plaintiffs.   *Fourth,* The deed contains not only a long covenant for the quiet enjoyment of "the hereditaments and premises thereby granted and conveyed, or intended to be," as against the grantors, and all persons claiming under them, but an indemnification also against "all other charges or incumbrances whatsoever, had, made, committed, executed, or done by them, the parties of the first part, or by, through, or with their acts, deeds, means, consent, procurement, or privity."   Now, it appears that the very notes in question, constituting the contested $41,000, were "charges or incumbrances," if they be a lien at all, contracted with the consent and procurement of the executors, including Mr. Pruyn.   "We agreed," says Mr. Pruyn, "to continue the business, during the current year, (1854), for the benefit of the estate."   And it was accordingly continued till the 1st January, 1855—a period of more than eight months; and in that period all the liabilities in question were incurred.   They come, therefore, as it seems to me, within the letter of the covenant of indemnity; and if that view be correct, the deed needs no reform.   *Fifth,* The understanding of the parties is

still further shown by the fact that, on the 3d of June, 1856, before the acknowledgments of the deed were fully completed, and while the transaction was, in some sense, still *in fieri*, one of the purchasers, as executor, filed his account in the surrogate's office, on the return of the summons to the other next of kin, and in it distinctly made the following charge: "Notes of the Peru Iron Co., 1 Jan., 1855, for the payment of which the estate was bound—41,737.01." It should be observed, too, that Mr. Pruyn's signature, as an executor, accompanies those of Theodore Saltus (one of the plaintiffs) and Mrs. Saltus, the other executor, at the foot of the petition on which the accounting was had, and that that petition bears date the 9th of April, 1856, only one day before the date of the letter from Mr. Pruyn, in which he declines, as yet, to sign the deed, alleging, as a reason, that Mr. Theodore Saltus, one of the intended purchasers, had not given him "*any* information as to the terms and conditions of sale." Surely, the payment or not of an additional $41,000 was an important *condition;* and how, then, could Theodore Saltus, if he had not given him "any information," have previously told him that the payment of an incumbrance to that amount, in addition to the $50,000, was one of the terms of the purchase? There is, at least, a seeming contradiction here, calling for explanation. *Sixth,* Although the position assumed by the plaintiffs was distinctly stated in the proceedings before the surrogate, and involved a difference, if any, of more than $41,000, yet the whole attention of the contestants, Mr. Pruyn and Mrs. Vence, seems to have been engrossed by two other sales, involving, together, a difference of less than one-fourth that amount. *Seventh,* The position assumed by the defendants involves this absurdity, that, although the indebtedness of the corporation was constantly fluctuating, the purchasers were to pay the fixed sum of $50,000, subject to that indebtedness—which might be ten thousand, or twenty thousand, or thirty thousand, or even fifty thousand dollars; in other words, that, in a serious bargain between business men, it was a matter of indifference to the purchasers whether they paid $50,000 or

$100,000 for the same identical thing. *Eighth.* The intrinsic value of the property, free and clear, according to the weight of the evidence, did not exceed $50,000, and its market or saleable value, leaving the offer of the plaintiffs out of view, instead of being double, did not, in all probability, reach half that sum.

It has been urged, in corroboration of Mr. Pruyn's view of the case, that when Mrs. Vence refused to give her sanction to the proposed sale, a larger sum than one-eighth of $50,000 was paid her, with a guaranty in addition against all debts. This objection, however, may well be answered by the allegation that it was a mere fractional concession to buy off a very serious difficulty. And the instrument, too, it may be observed, although drawn by a thoroughly qualified professional hand, wholly omits any recital of the alleged assumption of the $41,000 incumbrance, and merely indemnifies Mrs. Vence against any loss or damage "which may occur to *her* by reason of *her* being obliged to pay any debts, claims, or demands due by the said Peru Iron Company." It was a guaranty to hold "her, *the said Euphemia Vence,* harmless (and not the executors,) from the payment of any such debts," &c.; and was founded, no doubt, upon the idea, somewhat vaguely entertained, that stockholders in such corporations, in the event of deficiency, may be held liable personally to respond to the creditors. If more than this was intended, how does it happen that the draftsman of the instrument, who was also counsel both for Mrs. Vence and Mr. Pruyn in the proceedings before the surrogate, did not, in his testimony on that occasion, rebut the implied assertion to the contrary, made by Mr. Theodore Saltus in the charge of the $41,000, as already quoted?

A suggestion, however, has been made on the part of Mrs. Vence, which it is not easy to meet. If the purchasers, it is said, were to pay for the whole property $50,000 and no more, in other words, $9,000 over and above the debts, can it be conceived that they would have been willing, even as a peace offering, to pay within a thousand dollars of that amount for one-eighth? On the other hand, however, it may be asked,

if Mrs. Vence, under the arrangement as it stood, was to re-
ceive, in some way, as her share, between $11,000 and $12,000,
being one-eighth of $91,000, why should she, or her attentive
counsel for her, haggle, as it may be called, to get $8,000?
The only reliable answer to both questions would seem to be,
that the most unaccountable confusion of ideas prevailed on
both sides, resulting, in a great degree, from the confused
character, as we have seen, of the subject of the negotiations.

Should there, however, be sufficient ground, on the evidence,
for reforming the deed in controversy, and making it more
definite and certain, such a course, it is said, is precluded by
the decree of the surrogate, adjudging that the item in ques-
tion, " being the amount of the notes outstanding of the Peru
Iron Company, be stricken from the account rendered by the
executors."

The surrogate, it is true, on the evidence before him, de-
clared that, " being a debt of the Peru Iron Company, the
notes were to be paid by that company, and were not a
proper charge against the parties selling their interest in that
company." This adjudication, however, resulted from his
interpretation of the legal effect of the deed as it stood—an
opinion, the correctness of which is to be determined on the
appeal now pending in the general term of this court. As-
suming its correctness—as for the present, perhaps, we must
do—it furnishes an additional reason for the direct action of
the only tribunal which has jurisdiction to correct the instru-
ment. The surrogate, it is conceded, had no such power.

Outside, and independently of the alleged errors in the deed,
there is a point to be considered which has been scarcely ad-
verted to by counsel. The deed was void as against all par-
ties in interest who did not consent, or who, being under age,
were incompetent to consent. No trustee can, directly or in-
directly, become the purchaser of the subject of his trust. The
court, therefore, in behalf of the infants, is bound to direct a
reference to inquire into the true value of the property at the
time of the consummation of the sale, before making any de-
cree to reform the deed, or to give it effect even in its present

shape. Some evidence on that point was taken, as before stated, at the hearing in open court, but only in an incidental manner. It is the right of the infants that the question of value should be put in the form of a direct issue, and a report made thereon.

Mr. Pruyn, I observe, in one of his letters to Mr. Theodore Saltus or his counsel, objected to private bargains, and suggested that the only proper mode to determine values in such cases was a well advertised sale at auction. "This (says he, and very justly,) is the fairest way, and takes away all liability." It is to be regretted, for the peace of the family, that this advice had not been followed. An order, easily obtained, discharging, to that extent, Mr. Theodore Saltus from his duty as trustee, would have enabled him legally to have become a bidder on his own behalf, at the sale; and, by fixing the terms and conditions with clearness and precision, would, in all probability, have prevented the unfortunate misunderstanding and litigation which have ensued from the opposite course.

An order of reference must be entered, to inquire into the value of the property, as above suggested, and to reserve all further directions, as to whether the deed shall be modified, annulled, or affirmed, until the coming in of the referee's report.